IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

**WALTER PETERSON,**

**PLAINTIFF,**

VS.  NO.: 1:15cv204-SA-DAS

**LIBERTY LIFE ASSURANCE COMPANY
OF BOSTON,** *dba* **LIBERTY MUTUAL INSURANCE,**

**DEFENDANT.**

---

**COMPLAINT
PURSUANT TO 29 USC § 1132**

---

**COMES NOW**, the Plaintiff **WALTER PETERSON**, by and through the undersigned counsel, and pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132 (a)(1)(B) and (e), hereby files this Complaint against the Defendant, **LIBERTY LIFE ASSURANCE COMPANY OF BOSTON** *dba* **LIBERTY MUTUAL INSURANCE.**

**WHEREFORE** and in support of same, the Plaintiff so states:

**Facts and Procedural History**

1. Plaintiff, WALTER PETERSON (hereinafter "Plaintiff" or "Peterson"), was actively employed at the Starkville, Mississippi division of Nucor

employed at the Starkville, Mississippi division of Nucor Corporation ("Nucor") dba Gulf State Manufacturers LLC, from June 4, 1984, until ceasing work due to permanent disability on December 31, 2013.

2. As part of his employment with Nucor, the Plaintiff was provided an employee's disability benefits plan administered by Liberty Life Assurance Company of Boston, dba Liberty Mutual Insurance (hereinafter "Liberty"). This Plan, identified as Policy No.: GF3-850-289201-01 and attached hereto as Exhibit "A", provides for both short and long term disability benefits, depending upon an applicant meeting eligibility requirements.

3. Upon information and belief, Liberty is a foreign corporation which does business by agent or otherwise throughout the State of Mississippi.

4. On or about January 3, 2014, Peterson underwent abdominal surgery at Oktibbeha County Hospital Regional Medical Center for his severe abdominal pain and internal polyps. Specifically, Plaintiff had a colon resection for removal of polyps, a greater momentum resection, a right hemicolectomy, and an anastomosis.

5. Due to severe complications from these surgeries, including internal infection due to intestinal leakage, the Plaintiff had to undergo a second, transverse colon resection on January 7, 2014.

6. While attempting to recover from his surgeries, Peterson began experiencing additional medical ailments. These included chest pains, severe

shortness of breath, wheezing, associated fatigue, and issues with vertigo and dizziness.

7. Based on these complaints, the Plaintiff underwent cardiovascular and pulmonology testing. These tests, including a CT scan of his chest, determined that Peterson had a soft tissue mass in the lower lobe of his right lung. This mass, diagnosed as atelectasis (or partial collapse of the lung), was determined to be causing the chest pain complained of by Peterson.

8. In addition to causing chest pain, the collapsed lung's impact upon breathing was compounded by Peterson's Chronic Obstructive Pulmonary Disease (or COPD).

9. Further compounding his recovery was a flare up of Peterson's cervical and lumbar condition, with radiating pain and spasms. An MRI in March, 2014, documented degenerative disc disease and arthritis.

10. Based upon these conditions, Peterson's physicians (including his primary care physician Dr. David Booth of Eupora Family Medical Clinic, in Eupora, Mississippi) determined that he was unable to return to work.

11. Plaintiff's employer, Nucor, accepted this finding, and allowed the Plaintiff to remain on medical/disability leave until further notice.

12. Due to his health conditions, and the resulting inability to work, the Plaintiff requested short term disability payments from Nucor in February, 2014.

13. In March 2014, Plaintiff met the eligibility requirements for Short Term Disability through his employer and began drawing this benefit.

14. After ninety days of short-term benefits, on or about April 3, 2014, Plaintiff sought, and obtained, continuing benefits under Nucor's long term disability plan. This plan benefit was administered through Liberty and the benefit was paid out of Liberty's assets.

15. Through extensive medical documentation, including phone calls with the Plaintiff's physician, Plaintiff was found to be eligible for long term benefits under the Plan. These benefits were payable to Plaintiff at 60% of his pre-disability earnings.

16. Shortly thereafter, in June 2014, Plaintiff's application for Social Security Disability was approved. Liberty then reduced its monthly payments to the Plaintiff.

17. Plaintiff continued to obtain long term benefits throughout 2014, and maintained (per plan requirements) contact with Liberty regarding his health condition.

18. As part of its ongoing review process, Liberty hired Nina Rehman, D.O. of Medical Consultants Network in June, 2014, to review Plaintiff's medical records.

19. In her report, Dr. Rehman concluded that Plaintiff could only "sustain functionality for a total of 6 hours per day, and 30 hours per week" with limited

sitting, standing, walking, reaching, and bending. This was a restriction of less than full time employment.

20. On Monday, January 26, 2015, Liberty Claim Manager Danielle Dyer asked an in-house employee, Senior Vocational Rehabilitation Consultant Jane Howard, to prepare a transferable skills analysis/vocational review of the Plaintiff.

21. In the request for this report, Ms. Dyer noted that Ms. Howard should complete the Transferable Skills Analysis "based on restrictions form completed by Dr. Booth dated 01/13/2015 in the doc list." Dr. Booth's report did not opine on all medical issues of the Plaintiff.

22. No request was made by Ms. Dyer, or anyone else at Liberty, for Ms. Howard to review the entire medical record and/or medical restriction forms completed by Plaintiff's other treating physicians.

23. Liberty did not ask that Ms. Howard review their own, internal consultative report by Dr. Rehman opining as to Plaintiff's medical-based work restrictions.

24. In preparing the report, issued February 03, 2015, Ms. Howard stated that she reviewed the claim file as well as "researched standard vocational resources, including the Dictionary of Occupational Titles (DOT), Occupational Outlook Handbook (OOH), Occupational Information Network (O*Net)/Standard

Occupational Classification (SOC) coding system, guide for Occupational Exploration (GOE), etc.), the Bureau of Labor Statistic, and Internet job boards."

25. Based on this research and review, Ms. Howard stated that she found four (4) occupations "identified as being within Mr. Peterson's education, training, and current physical capacities."

26. Per the report, these occupations are listed as follows: "Weigh Clerk (e.g., Scale-house); Service Clerk (e.g., scheduling service/installation appointments); Order Clerk; and Production Clerk."

27. Although the general title of these jobs are listed, there are no identifying occupational codes associated with same either in Ms. Howard's report and/or in the subsequent notices issued by Liberty regarding the denial of benefits.

28. The administrative record has no indication that a request for occupational codes, and/or verifying information regarding these proposed jobs, was ever requested by Liberty from Ms. Howard.

29. The administrative record has no indication that Liberty conducted a financial analysis for the "Any Occupation" component of Plaintiff's long-term benefit eligibility under the Plan.

30. Two of the jobs identified by Liberty as being within the "Any Occupation" abilities of the Plaintiff have national monthly wages below the required 60% of his pre-disabled earnings. Specifically, Ms. Howard opined that

Plaintiff was able to do the full time work of a "Weigh Clerk" and/or as an "Order Clerk".

31. Although the care for his condition continued to be treated, and documentation provided to Liberty confirmed same, Liberty discontinued Plaintiff's long term benefits on February 23, 2015. Liberty opined (based in large part on the vocational report issued by Jane Howard) that Plaintiff no longer met the medical qualifications for disability as outlined in the Plan, and that benefits would cease on April 1, 2015.

32. Plaintiff, through an attorney, filed an administrative appeal within the Prescribed 180 day time frame, which included additional, substantiating medical documentation of his condition and its impact upon Plaintiff's ability to work.

33. Despite same, Liberty maintained its denial and issued a final determination on April 29, 2015.

34. In its denial, Liberty cited all four vocations identified by Jane Howard in her report, as evidence that Plaintiff no longer met the any occupation definition of the Plan.

35. The April 29, 2015, denial of benefits claim letter issued by Liberty Mutual did not mention and/or cite to the Plan requirements for a financial analysis of the proposed "Any Occupations."

36. The administrative appeal was the only administrative claim remedy

available to the Plaintiff under the Plan.

37. Plaintiff has been informed by Liberty that no further administrative review shall be conducted on his claim and that he has exhausted all claim remedies. This suit so follows.

**The Plan**

38. In denying benefits under the Long-Term Disability Provisions of the Plan, Liberty relies upon the definition of disability found in Section 2 "Definitions" of the Plan documents:

*"Disability" or "Disabled" means:*

*1. For persons other than pilots, co-pilots, and crewmembers of an aircraft:*

    *i. "Disability" or "Disabled" means that during the Elimination Period and the next 12 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and*

    *ii. Thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.*

39. Per the February 23, 2015, notice of denial of claim, this is the only provision in the Plan which is used by the Plan administrator to deny benefits to Peterson.

40. In Liberty's April 29, 2015, notice of denial of claim (post administrative appeal), the same provisions cited above were also used to deny ongoing benefits. In addition, Liberty cited the definition of "any occupation" as follows: "'Any occupation' means that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity."

41. However, other portions of the Plan (including those NOT cited by Liberty in their denial letters) must be considered by this Court in determining the wrongful nature of the Administrator's decision to deny benefits, including the following provisions:

- *Section I: Schedule of Benefits for Long Term Disability Coverage:* "*Any Occupation means any occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity.* ***If the Covered Person is unable to earn more than 60% of his pre-disability earnings, he will be considered unable to perform Any Occupation.***"

- *Amendment No. 3:* "*It is agreed the following changes are hereby made to this policy- GF3-850-289201-01: In Section 1, a note was added clarifying that the Any Occupation will contain a 60% earnings test for Classes 1 and 2. . . the effective date of this Change is January 1, 2009. The changes will only apply to Disabilities or Partial Disabilities which start on or after the effective date of this change.*"

- *Section IV: Disability Income Benefits/ Long Term Disability Coverage- Discontinuation of Long Term Disability Benefits:*

  *The Monthly Benefit will cease on the earliest of:*

1. *The date the Covered Person fails to provide Proof of continued Disability or Partial Disability and Regular Attendance of a Physician;*
2. *The date the Covered Person fails to cooperate in the administration of the claim. Such cooperation includes, but is not limited to, providing any information or documents needed to determine whether benefits are payable or the actual benefit amount due;*
3. *The date the Covered Person refuses to be examined or evaluated at reasonable intervals;*
4. *The date the Covered Person refuses to receive Appropriate Available Treatment;*
5. *The date the Covered Person refuses a job with the Sponsor where workplace modifications or accommodations were made to allow the Covered Person to perform the Material and Substantial Duties of the job;*
6. *The date the Covered Person is able to work in his Own Occupation on a part-time basis, but chooses not to;*
7. *The first day of the month following the date the Covered refuses to fully participate in a Rehabilitation Program recommended by Liberty according to the individually written Rehabilitation Program;*
8. *The date the Covered Person's current Partial Disability earnings exceed 80% of his Indexed Basis Monthly Earnings; Because the Covered person's current earnings may fluctuate, Liberty will average earnings over three consecutive months rather than immediately terminating his benefit once 80% of his Indexed Basic Monthly Earnings has been exceeded;*
9. *The date the Covered Person is no longer Disabled according to this Policy;*
10. *The end of the Maximum Benefit Period; or*
11. *The date the Covered person dies.*

42. In addition, the Plan allows for Liberty, to have full authority for interpreting the terms of the policy and determining benefits thereto. Specifically, Section 7 of the "General Provisions" section provides as follows:

*Interpretation of the Policy:*

*Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding.*

43. However, Liberty is not the plan administrator, but rather Nucor is plan administrator. No Plan document has been provided in which the plan administrator reserved such discretion and then delegated this discretion to Liberty. A request for all documents used by Liberty on this claim has been made and the documents received do not support the assertion made by Liberty in the previous paragraph.

**Jurisdiction and Standard of Review**

44. Jurisdiction over the instant Complaint is based on 28 U.S.C. § 1331 and 29 U.S.C. §1132 (a)(1)(B) and (e), because the Nucor Group Policy under which benefits are payable is governed by the Employee Retirement Security Act of 1974 ("ERISA").

**Count I:**

45. The Plaintiff incorporates by reference all prior paragraphs of this Complaint.

46. Liberty's denial of Peterson's Long Term Disability benefits was wrongful as the medical records, administrative file, and vocational assessments clearly document Peterson's ongoing medical condition, earning capacity, employment restrictions, and resulting eligibility for benefits under the Plan.

47. The Plaintiff has been unable to work at his own occupation or any other, since going on permanent disability leave on December 31, 2013. This is due to his medical condition.

48. Plaintiff's only source of income is Social Security disability.

49. Through his earning record post-disability, Plaintiff has documented his inability to earn income pursuant to the Plan guidelines.

50. It was error for Liberty to hold that Plaintiff could meet the financial component of any occupation, by listing two jobs in its April, 2015, denial which clearly fell outside of the required wage range of the Plan definitions.

51. Liberty committed error when it found evidence that Plaintiff's medical Condition had improved so as to allow him to return to "any occupation" under the Plan. Liberty is inconsistent in its decision making.

52. Liberty's own internal review produced work place restrictions, including a maximum 30 hour work week, which mirrored and added to restrictions identified by Plaintiff's own treating general practitioner and pulmonologist.

53. These work place restrictions, including a maximum 30 hour work week, preclude Plaintiff from performing "with reasonable continuity, the Material and Substantial Duties of Any Occupation" as per the Plan.

54. Liberty failed to advise its vocational expert, Jane Howard, to consider these conditions and limitations in providing an assessment of Plaintiff's vocational

ability.

55. Liberty failed to consider these medical and vocational restrictions pursuant to the Plan definitions when adopting Jane Howard's report in support of denying benefits to the Plaintiff.

56. Liberty wrongfully and in violation of its obligations under ERISA, has denied long term disability benefits to the Plaintiff, and engaged in a bad faith pattern and practice of paying the claim, and then denying the claim without any evidence of improvement in the Plaintiff's condition and/or changes in his ability to perform "Any Occupation" under the Plan definitions.

**WHEREFORE**, the Plaintiff demands judgment against Liberty, and requests relief from this Court as follows:

a) For the sum of all past due, long term disability benefits;

b) For reinstatement of Plaintiff's claim to all present and future long term disability benefits under the Plan;

c) For interest on all past-due benefits;

d) For an award of Attorney's fees;

e) For this Court to substitute Claims Administrator for the Plaintiff's Claim at the expenses of Liberty for the duration of this Claim; and

f) Any and all other relief available to this Court that it so deems appropriate.

## Count II:

57. The Plaintiff incorporates by reference all prior paragraphs of this Complaint.

58. Liberty is required, per the federal claim procedure regulations found at 29 CFR § 2560.503-1, to maintain a consistent claim decision making process.

59. Liberty's denial of Peterson's Long Term Disability benefits was wrongful, as the Claim file documents a failure to fully and consistently review the evidence in his file in comparison with the Plan requirements.

60. Liberty breached its fiduciary duty to the Plaintiff by failing to provide a full and fair review, consistent with the requirements of the Plan and the federal code governing ERISA claims. This is a regular issue for many disability claimants which Liberty insures.

61. The Plaintiff has been forced to incur attorney's fees and costs, in his pursuit of obtaining a fair and impartial review of his claim.

62. Equitable relief should be granted to the Plaintiff, so that he is placed in the same position he would have been in had Liberty followed the Plan requirements and federal code regulations governing ERISA Claims.

**WHEREFORE**, Plaintiff demands judgment in the form of equitable relief against Liberty as follows:

a) For restitution equal to the sum of all past due, long term disability benefits;

b) For reinstatement of Plaintiff's claim to all present and future long term disability benefits under the Plan;

c) For interest on all past-due benefits;

d) For an award of Attorney's fees;

e) For this Court to substitute Claims Administrator for the Plaintiff's Claim, to another, non-biased Claim Administrator agreeable to the Plaintiff, at the expenses of Liberty for the duration of this Claim; and

f) Any and all other relief available to this Court that it so deems appropriate.

Respectfully submitted, this, the 24th of November, 2015.

Amanda H. Meadows (MSB# 104968/ Fla. Bar No.: 10662)
*Attorney for Plaintiff Walter Peterson*
Meadows Law Group, LLC
3600 Bluecutt Rd.
Suite 5
Columbus, Mississippi 39705
PH: 662-251-0402
FX: 662-796-3043
Amanda@MeadowsLawGroup.com